# STATE OF MICHIGAN

# COURT OF APPEALS

RONALD MOIR,

       Plaintiff-Appellant,

UNPUBLISHED
February 11, 2016

v

JEANA GARCIA MOIR,

       Defendant-Appellee.

No. 323725
Livingston Circuit Court
LC No. 13-047696-DM

Before: BOONSTRA, P.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

Plaintiff appeals as of right a judgment of divorce that granted defendant sole legal and sole physical custody of the parties' minor children, awarded plaintiff limited parenting time, awarded child support, and divided the marital property. On appeal, plaintiff argues that: (1) the trial court erred in finding that defendant's business, Advanced Underground Inspection, L.L.C. (AUI), maintained negative equity, resulting in an unfair and unequal division of marital assets; (2) the trial court abused its discretion in determining the parties' incomes for purposes of calculating child support; (3) the trial court erred in awarding sole legal custody of the parties' minor children to defendant; and, (4) the trial court erred in denying plaintiff's request for frequent and liberal parenting time. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The parties were married on June 8, 1996 and have three minor children: N., S., and C.. At the time of trial, the parties owned the following real estate: (1) the marital home on Moir Road (marital home); (2) a cottage up north; (3) a condominium in Brighton (condo); and, (4) two vacant lots adjacent to the marital home. Defendant owned AUI and plaintiff also owned his own business, Livingston Lending, Inc. (Livingston Lending). At trial, the primary issues involved the businesses' worth, the parties' respective incomes, child custody, and child support. Plaintiff blamed defendant's spending and anger issues for the breakdown of their marriage. In contrast, defendant blamed plaintiff's drug/alcohol abuse, infidelities, and anger issues for the breakdown of the marriage.

The parties had a tumultuous marriage. Plaintiff had a drug and alcohol problem that dated the entire marriage. He had points of sobriety and, at the time of trial, claimed to have been clean and sober through sheer will power for over a year. In addition to plaintiff's substance abuse issues, the marriage was plagued with his extramarital affairs. Plaintiff admitted

-1-

to having at least two long-term affairs during the marriage and also admitted to promiscuity at strip clubs. Plaintiff left the marital home in November 2011 and took up permanent residence in the parties' condo while defendant continued to live in the marital home with the children. In the summer of 2012, it appeared that the parties might reconcile. They had dinner out with the children one night with plaintiff returning to his condo and defendant returning home with the children. The next morning, defendant decided to bring plaintiff breakfast. She knocked on the condo door, but plaintiff did not answer. Defendant became concerned because she knew that plaintiff had been depressed, so she decided to crawl through one of the windows. There was evidence that plaintiff was entertaining a female friend. Defendant got back into her car and rammed the condo's garage several times. She was criminally charged, placed on probation, and ordered to pay restitution. This is what the parties refer to as the so-called "condo incident."

Plaintiff contends that after the condo incident, defendant set out to alienate him from the children. He believed that he had a strong relationship with all three children prior to that and that defendant had no trouble allowing him access to the children until the incident. However, there was evidence that plaintiff had more than one physical encounter with N. long before the condo incident. On one occasion in 2009, plaintiff choked N. by grabbing her around the neck after she was disrespectful towards her grandfather (choking incident). On another occasion in 2010, plaintiff shoved N. down to the floor after he became frustrated that she could not find her brother's shoes (pushing incident). By all accounts, N. had very strong opinions about her father that had nothing to do with defendant. At the time of trial, N. and S. saw plaintiff only in a therapeutic setting. Plaintiff saw C. in an unsupervised setting on Sundays.

Plaintiff's lifestyle caused him to be estranged from both his sister and his mother. Both women were deeply religious and ultimately restored their relationship with plaintiff, utilizing their church's pastor and his wife in counseling. Both women confirmed plaintiff's past behavior but believed that plaintiff had finally changed.

Until 2008, the parties enjoyed a comfortable lifestyle. Plaintiff earned over $400,000 a year in the mortgage industry until the bottom fell out of the market during the Great Recession. The parties then had to look to AUI as their primary source of income. Defendant was responsible for AUI's day-to-day operations. Instead of drawing paychecks, defendant used AUI's American Express card for personal expenses. These charges were considered distributions. The company struggled. At one point AUI owed over $300,000 in payroll taxes, exclusive of interest and penalties. AUI was in trouble with the IRS and, at the time of trial, was on a payment plan to pay back the roughly $900,000 it owed. Plaintiff blamed defendant's poor management and spending for running AUI into the ground. He requested that his initial infusion of cash to help AUI get started be considered either an equity interest in the company or a loan that defendant should repay. However, the evidence revealed that both plaintiff and defendant had agreed to subordinate their loans to AUI in order to secure lending for an SBA loan. The SBA loan was secured by, among other things, the parties' condo. Plaintiff also complained that defendant had violated a court order not to dispose of assets when she sold the Corvette AUI had purchased for plaintiff's birthday.

On August 29, 2014, the trial court entered the Judgment of Divorce. The Judgment awarded defendant legal and physical custody of the minor children and granted plaintiff parenting time with the children every other Saturday from 9:00 a.m. to 4:00 p.m., one Sunday a

month from 9:00 a.m. to 4:00 p.m., and "additional parenting time as may be agreed between the parties, if [defendant] believes it is appropriate." The trial court indicated it would review parenting time on December 4, 2014, and "consider expanding parenting time if appropriate." Regarding the division of property, the judgment awarded the marital home to defendant, the condominium to plaintiff, the cottage to defendant, and the vacant lots to plaintiff. The trial court awarded plaintiff three vehicles and awarded the contents of the marital home and cottage to defendant, other than plaintiff's personal effects and clothing. The parties were ordered to pay their own debt. The parties were also awarded their own businesses. They were required to divide the Jackson Life annuity and were awarded their own retirement plans and bank accounts.

## II. PROPERTY DIVISION

Plaintiff first argues that the trial court committed clear error when it found that AUI maintained "negative equity" and, therefore, awarded 100 percent of AUI to defendant, resulting in an unfair and inequitable division of the martial assets. We disagree.

"In a divorce action, this Court reviews for clear error a trial court's factual findings on the division of marital property." *Hodge v Parks*, 303 Mich App 552, 554; 844 NW2d 189 (2014). "Findings of fact, such as a trial court's valuation of particular marital assets, will not be reversed unless clearly erroneous." *Woodington v Shokoohi*, 288 Mich App 352, 355; 792 NW2d 63 (2010).

> Findings of fact are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made. Special deference is afforded to a trial court's factual findings that are based on witness credibility. This Court further reviews whether a trial court's dispositional rulings are fair and equitable in light of the trial court's findings of fact, but this Court will reverse only if definitely and firmly convinced that the disposition is inequitable. [*Hodge*, 303 Mich App at 554 (internal quotation marks and citations omitted).]

Plaintiff filed for bankruptcy during the divorce proceedings and the trustee intervened. Prior to that, defendant and the trustee had entered into a settlement agreement. This agreement was not approved or entered by the bankruptcy court; instead, the bankruptcy court referred the matter to the trial court to determine whether the agreement was fair and equitable. Plaintiff argues that the proceedings were "sullied" by the introduction of a settlement agreement. However, there is no evidence that the trial court considered the agreement. In fact, quite the opposite is true. The following exchange took place during plaintiff's closing arguments:

> MR. McCRIRIE: [The bankruptcy trustee, Mr. Beadle] commented to you that the June 26[th], 2014 order of the Federal Court somehow adopted some settlement between Mr. Beadle and Jeana Moir.

> THE COURT: I've never heard that settlement.

> MR. McCRIRIE: I understand you haven't. And I'm not going to tell you what it was.

> THE COURT: And I haven't read it.

MR. McCRIRIE:  But here's what the order says, this is the order that Mr. Beadle told you about.  Okay.  It says, "It's further ordered and consistent with In Re: White, 1988 case, the Trustee," that's Mr. Beadle on his behalf, "is authorized to advise the State Court of the interest of the estate and the grounds of the motion that would be approved by this Court.  But only for the purposes of allowing the Court to determine if this is a fair and equitable settlement among the parties."

Doesn't say anywhere in this order that it was approved, sanctioned, anything.  What it says I, Mr. Beadle can come here, and advise you of the interest in the estate and the motion would be approved by this Court, but only for the purposes of allowing the Court, you, the Circuit Court, to determine if it's – if this is a fair and equitable settlement between the parties.  There is no order from any Federal Court indicated that they have approved any settlement whatsoever.

Plaintiff then argues that the trial court erroneously found that AUI had negative equity.  However, this position in in stark contrast to plaintiff's position in the trial court.  The following exchange took place regarding the value of the parties' respective businesses:

MR. HARRIS [counsel for defendant]:  Your Honor, there is perhaps one stipulation.  There are two business interests here, Mr. Moir has Livingston Lending, my client has what's called AUI, and there will be no witnesses brought in who will testify that either of these business[es] inherently has any value as property, and so, *they have zero value* for property settlement purposes, so we're not going to have expert witnesses brought in for that purpose.

THE COURT:  Mr. McCririe?

MR. McCRIRIE:  Judge, we, I think that the testimony that the Court's going to hear in this case is, is that *the businesses may [have] some value, but the debt on those businesses far exceeds what their value is*.  I think that's what you will hear at trial.

THE COURT:  Well, do we have a stipulation or not?

MR. HARRIS:  Well, I think that's what that means *for property purposes so there's no value to it, because the debt exceeds the assets*.

***

MR. McCRIRIE:  Judge, *as we sit here today neither one of the businesses has any value*.

MR. HARRIS:  Thank you.

THE COURT:  Okay.  [Emphasis added.]

This Court has recently reiterated that "a party cannot request a certain action of the trial court and then argue on appeal that the action was error." *People v Perkins*, ___ Mich App ___;

-4-

___ NW2d ___ (Docket No. 323454, issued January 19, 2016), slip op, p 10, quoting *People v McCray,* 210 Mich App 9, 14; 533 NW2d 359 (1995). In fact, plaintiff "created the very error that [he] wishes to correct on appeal" and "may not harbor error at trial and then use that error as an appellate parachute." *Perkins*, slip op, p 10, quoting *People v Szalma,* 487 Mich 708, 726; 790 NW2d 662 (2010). Quite simply, plaintiff conceded that AUI had negative equity.

Further support that plaintiff conceded that AUI had no value was his overall approach during trial. Essentially, plaintiff argued that AUI had no value because of defendant's poor management. During opening statements, plaintiff's attorney stated:

> So, Judge, the position of Mr. Moir in this case is that Ms. Moir used Advanced Underground to pay all of her personal expenses. Now, you can call it shareholder distribution, you can call it compensation for her position as President, you can call it whatever you want to call it, and as I've told Mr. Moir many times, a rose by any other name is still a rose. And the fact of the matter is, is that that money is gone.
>
> That money should be handled in one of two ways, Judge, this Court shouldn't just allow that money to evaporate. It has to be handled in one of two ways, either Ms. Moir has to take it as income for purposes of calculating child support, and for purposes of calculating spousal support or she's got to pay it back in some way, because this was a marital, or is a marital asset, and now essentially *it's worth nothing, because of Ms. Moir's mismanagement or poor management.* [Emphasis added.]

Because AUI had no value, plaintiff's attorney asked that plaintiff be awarded half of the $750,000 he loaned AUI.

Whether plaintiff's loans to AUI should have been deemed a loan that AUI had to pay back or whether it was considered a membership interest was a running theme during trial. During plaintiff's cross-examination, the trial court noted: "[Plaintiff] agreed that AUI would have to be making money in order to be able to pay the loans back. . . .At least that's a finding that I'm going to make." The trial court questioned plaintiff:

> THE COURT: If you had a choice between two propositions, one receiving ownership interest in AUI, and being personally responsible for an equal portion, a percentage of the IRS loan, that's one proposition, versus just not having an interest in AUI at all, and being absolved of any personal responsibilities for the IRS loan, which proposition would be your choice?
>
> THE WITNESS: Out of those two propositions, sir?
>
> THE COURT: Right.
>
> THE WITNESS: Equity interest.
>
> THE COURT: You would rather have an equity interest in the business and be responsible proportionally for whatever portion –

-5-

THE WITNESS:  Depending on what the –

THE COURT:  -- of the IRS loan was?

THE WITNESS:  Depending on what the portion is, I mean.  That's kind of, I mean, it's kind of like the rest of the story.  I mean, what's the proportion of the IRS debt?  I may make my decision a little different, I might make it for or against it.

THE COURT:  Let's just say it's if you have 50 percent of the AUI, you get 50 percent of the IRS debt.  Be responsible for it as part of this judgment versus just walking away from it.

THE WITNESS:  Want my decision right now?

THE COURT:  That's a question, yeah.

THE WITNESS:  Then I would take the AUI and the debt.

During closing arguments, plaintiff's counsel advised the court that it put plaintiff in an untenable position by asking him to choose between letting AUI go or having an equity interest subject to the IRS debt.  "[M]y client wants you to issue an order of spousal support for him in the amount equal to the loans that are presently outstanding, the amount of money that everybody agrees that he gave to AUI of $566,000."  Plaintiff wanted the trial court to order AUI to either pay back the loan or permit plaintiff to have an equity interest without the encumbrance.

It was noted that the bankruptcy trustee had stated that if the trial court determined that plaintiff had an equitable interest in the company, it would become an asset of the bankruptcy estate.  Trial court noted that "it almost seems like if you wanted to benefit his kids, [plaintiff] would argue something else."  Defense counsel agreed that it made no sense to give plaintiff equity from AUI to pay his creditors whose debts had already been discharged.

Given plaintiff's acknowledgement that AUI was not worth much, the trial court noted that "when I get into asset division in this case, what I'm talking about is who walks out with the most debt.  Not who walks out with the most stuff.  But who walks out away with the most debt."  The trial court found that AUI was "treated as a marital or family business" with each party paying for personal expenses.  While plaintiff was not involved in the day-to-day operations, he did have suggestions and was attempting to protect his investments.  The trial court also noted that plaintiff acknowledged AUI's problems:

> Mr. Moir testified that he had experts look at the books and was advised that AUI was worth nothing.  That she, his wife owes $800,000 personally to the IRS.  And AUI, between the SBA loan plus the line of credit, owes almost a million on that.  He testified that everybody tells me today that it is worth nothing.  He believed his wife had driven the business into the ground.  He testified that he wanted spousal support, that he wants an interest in the business, and that he should have a stream of income from the business.

Plaintiff also complains bitterly that a Plante Moran restatement was considered because it was "hearsay" evidence. Once again, this is an "error" that plaintiff brought upon himself. Plaintiff stipulated to its admission at trial. Moreover, plaintiff cannot escape the fact that his own expert relied heavily upon the report. His expert used information prepared by Plante Moran in calculating defendant's income, explaining, "I believe Plante Moran is a more credible accounting firm to be doing the books, and the books seem to be in somewhat better shape starting in 2013 compared to previous years." And "I basically used Plante Moran's numbers."

Contrary to plaintiff's assertions on appeal, the trial court did not clearly err in finding that AUI had negative equity. The point was conceded at trial and the evidence indicated that plaintiff was well aware of AUI's financial difficulties. Plaintiff's arguments and calculations on appeal are new and not supported by the record.

## III. CHILD SUPPORT

Plaintiff next argues that the trial court abused its discretion in calculating the parties' respective income in calculating child support. We disagree.

"We review a trial court's finding of facts underlying an award of child support for clear error." *Carlson v Carlson*, 293 Mich App 203, 205; 809 NW2d 612 (2011). Assuming there is no clear error as to any material fact, a trial court's child support order is reviewed for an abuse of discretion. *Peterson v Peterson*, 272 Mich App 511, 516; 727 NW2d 393 (2006). An abuse of discretion occurs when the outcome is not within the range of principled outcomes. *Borowsky v Borowsky*, 273 Mich App 666, 672; 733 NW2d 71 (2007).

The parties appeared before Conciliator Kathleen Oemke on November 20, 2013. Oemke noted that "[t]he parties' financial matters are very difficult to untangle." She found as follows:

> Mr. Moir had not filed his 2012 tax return but provided one that he represented would be filed. The veracity of the tax return is questioned. Mr. Moir's books and records according to previous discovery do not exist. Mr. Moir's business made deposits in 2011 of $196,000 and income was $62,000. For his 2012 purported return, he had receipts of $253,000-$260,000 and claimed and [sic] income over $12,335. His employees earned $42,000/year. This does not make sense unless he is reaping other benefits from the business. Since the return is based on self-employment, more discovery would be necessary and documentation would be necessary to justify belief in these figures. He would be at least imputed with an income that he pays his other employees. His house payment alone is $15,600/year. For purposes of this temporary order, $62,000 will be used. This takes into consideration that he will no longer have debt for which he will be responsible.
>
> Ms. Moir admits to $125,000/year and may have more income. It is Mr. Moir's belief that she earns $250,000. Nor further information was available. Ms. Moir provides health care expenses of $1,108.07 for medical and $65.26 for dental for a total of $1,173.33 for five people or $703.99 for the three children. At this time

$125,000 will be used. Upon further discovery or trial the child support may be revised to reflect the income figures as revealed by the evidence.

At trial, the trial court used Oemke's recommendation, which adjusted defendant's income to $125,000 and plaintiff's to $62,000. The trial court acknowledged one year when defendant took distributions of $192,000, but defendant's average income was $120,000 to 150,000. As for plaintiff:

Certainly, [defense counsel] called into question, a diminishing net return based upon the gross revenues. And I do find and agree that its suspect. So he had taken with net adjustment put back in for the 2013 income brought Mr. Moir's income up to approximately $52,000. And I'm going to impute an additional $10,000 for ability to earn on top of that. And also based upon the fact that – I have and I do believe that there is some – suspicion there based on the records and based upon my lack of finding Mr. Moir to be completely credible with his testimony.

The trial court's findings are supported by the record. While plaintiff claims that the *only* testimony regarding defendant's income was from defendant herself, the record reveals otherwise. Thomas Nester, AUI's accountant since 2010, testified that defendant's income for 2012 was $121,000 and for 2013 it was between $110,000 to $130,000. He acknowledged that defendant's total distributions for 2013 amounted to $192,000, but explained that the additional amount was to pay "extraordinary expenses" such as restitution and legal fees.

In contrast, plaintiff's expert, Akono Gross, determined that defendant's average annual income was $222,245. For 2011, Gross looked at three random months for the American Express card and determined that 90 percent of the charges were defendant's personal expenses. He also looked at the dividends and distributions reported on the 2011 balance sheet. He believed her 2011 income was $263,000. Using this same method, Gross determined that defendant's 2012 income was $275,019.13. The trial court took issue with Gross's method of calculating defendant's personal expenses when looking at the American Express statements. Gross explained that the lack of proper records and logs was problematic and "[i]f you don't have documentation, it's all disallowed expenses." Essentially, Gross imputed as defendant's personal expense anything that was not clearly a business expense. Using Plante Moran's information, Gross determined defendant's 2013 income to be $192,700. He also used their numbers for 5 months of 2014, which showed defendant's income to be $45,484. Extrapolated for the entire year, defendant's 2014 income would be $109,161. Gross acknowledged that defendant's income trended downward and she also spent less each year. The trial court did not clearly err in setting defendant's average annual income at $125,000 a year.

Nor did the trial court err in setting plaintiff's average annual income at $62,000. It is clear from the trial court's findings that the evidence of plaintiff's income was suspect. Using the three-year look-back, Gross calculated plaintiff's average income as $28,507 a year. Plaintiff's tax return for 2013 indicated an income of $29,900. But Gross used only records provided by plaintiff, which consisted only of bank records of money going in and out. Plaintiff had substantial deposits until he filed for bankruptcy. "A trial court is not limited to considering only a parent's actual income when assessing that parent's ability to pay support. Rather, the

trial court may consider the parent's voluntarily unexercised earning ability." *Reed v Reed*, 265 Mich App 131, 163; 693 NW2d 825 (2005) (internal citation omitted). In this case, it was not so much that plaintiff was intentionally under-earning, it was that he was failing to report his true earnings.

## IV. CUSTODY

Plaintiff next argues that the trial court abused its discretion and went against the great weight of the evidence in awarding sole legal custody of the children to defendant. We disagree.

"To expedite the resolution of a child custody dispute by prompt and final adjudication, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. "Under this standard, a reviewing court should not substitute its judgment on questions of fact unless the factual determination clearly preponderates in the opposite direction." *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010). In so doing, the Court must "defer to the trial court's credibility determinations given its superior position to make these judgments." *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011). "This Court reviews questions of law for clear legal error, which occurs when the trial court incorrectly chooses, interprets, or applies the law. Finally, we consider the trial court's discretionary rulings, such as custody determinations, for an abuse of discretion." *Id*.

From the outset, it should be noted that plaintiff does not contest the trial court's decision to award defendant sole physical custody of the children. When addressing the custody issue, the trial court found that plaintiff was essentially "an absentee [parent]" and that the children's established custodial environment was with defendant, with whom the children lived since plaintiff left the home in November 2011. Plaintiff had no overnights with the children while the case was pending. The trial court noted that its long-term goal was to facilitate a relationship with plaintiff, but that the children had to be safe.

In its ruling, the trial court addressed each of the best interest factors in MCL 722.23:

A. THE LOVE, AFFECTION, AND OTHER EMOTIONAL TIES EXISTING BETWEEN THE PARTIES INVOLVED AND THE CHILD.

The trial court found that this factor favored defendant because, while both parties loved the children, the children had been subjected to plaintiff's bad behavior.

B. THE CAPACITY AND DISPOSITION OF THE PARTIES INVOLVED TO GIVE THE CHILD LOVE, AFFECTION, AND GUIDANCE AND TO CONTINUE THE EDUCATION AND RAISING OF THE CHILD IN HIS OR HER RELIGION OR CREED, IF ANY.

The trial court found that this factor favored defendant because she was the one that had been "providing them their schooling, paying for the counseling, paying for their clothing, providing their transportation" and was involved in their academic affairs. In contrast, plaintiff had "minimal involvement with the kids" since he moved out of the marital home in November 2011. The trial court also pointed to plaintiff's explosive anger and substance abuse.

### C. THE CAPACITY AND DISPOSITION OF THE PARTIES INVOLVED TO PROVIDE THE CHILD WITH FOOD, CLOTHING, MEDICAL CARE OR OTHER REMEDIAL CARE RECOGNIZED AND PERMITTED UNDER THE LAWS OF THIS STATE IN PLACE OF MEDICAL CARE, AND OTHER MATERIAL NEEDS.

The trial court found that this factor favored defendant because defendant provided for all of their care.

### D. THE LENGTH OF TIME THE CHILD HAS LIVED IN A STABLE, SATISFACTORY ENVIRONMENT, AND THE DESIRABILITY OF MAINTAINING CONTINUITY.

The trial court found that this factor favored defendant, who provided a safe environment.

### E. THE PERMANENCE, AS A FAMILY UNIT, OF THE EXISTING OR PROPOSED CUSTODIAL HOME OR HOMES.

The trial court found that this factor weighed equally.

### F. THE MORAL FITNESS OF THE PARTIES INVOLVED.

The trial court found that this factor favored defendant given plaintiff's illegal behavior, domestic violence, and physical abuse of the children. The trial court believed the shoving and choking incidences that N. described. It also pointed to plaintiff's drug use and prior drunken driving offenses.

### G. THE MENTAL AND PHYSICAL HEALTH OF THE PARTIES INVOLVED.

The trial court found that this factor favored defendant because of plaintiff's rage, "mental health" and plaintiff's bad behavior brought about by drug and alcohol abuse.

### H. THE HOME, SCHOOL, AND COMMUNITY RECORD OF THE CHILD.

The trial court found that this factor "slightly" favored defendant, but that plaintiff was also active in coaching the children.

### I. THE REASONABLE PREFERENCE OF THE CHILD, IF THE COURT CONSIDERS THE CHILD TO BE OF SUFFICIENT AGE TO EXPRESS PREFERENCE.

The trial court indicated that it had interviewed Nina and had "taken those conversations into consideration as part of my decision."

### J. THE WILLINGNESS AND ABILITY OF EACH OF THE PARTIES TO FACILITATE AND ENCOURAGE A CLOSE AND CONTINUING PARENT-CHILD RELATIONSHIP BETWEEN THE CHILD AND THE OTHER PARENT OR THE CHILD AND THE PARENTS.

The trial court found this factor equally weighted, though it did note that plaintiff had been "paranoid" and convinced that defendant was poisoning the children against him.

## K. DOMESTIC VIOLENCE, REGARDLESS OF WHETHER THE VIOLENCE WAS DIRECTED AGAINST OR WITNESSED BY THE CHILD.

The trial court found that this factor "definitely favors Mrs. Moir."

## L. ANY OTHER FACTOR CONSIDERED BY THE COURT TO BE RELEVANT TO A PARTICULAR CHILD CUSTODY DISPUTE.

The trial court found that this factor favored defendant because plaintiff failed to exercise parenting time.

The trial court concluded: "So given that, and with the custodial environment having been with Mrs. Moir, I am going to award sole legal and sole physical custody of the minor children to Mrs. Moir."

In this instance, because plaintiff does not contest the trial court's order regarding physical custody, "joint custody" means legal custody. *Dailey v Kloenhamer*, 291 Mich App 660, 670; 811 NW2d 501 (2011). Joint legal custody means that "the parents shall share decision-making authority as to the important decisions affecting the welfare of the child." MCL 722.26a(7)(b). However, in deciding whether joint custody is in the children's best interest, a court must determine "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." MCL 722.26a(1)(b). A "trial court properly denies joint custody. . .where the parties cannot agree on basic child-rearing issues. *Lombardo v Lombardo*, 202 Mich App 151, 157; 507 NW2d 788 (1993). Here, given the parties' highly contentious relationship and plaintiff's bad behavior, it made perfect sense for the trial court to award sole legal custody to the same parent that had sole physical custody of the children. We find no error.

## V. PARENTING TIME

Finally, plaintiff argues that the trial court erred in granting such limited parenting time. We disagree.

"Orders concerning parenting time must be affirmed on appeal unless the trial court's findings were against the great weight of the evidence, the court committed a palpable abuse of discretion, or the court made a clear legal error on a major issue. A court commits legal error when it incorrectly chooses, interprets, or applies the law." *Pickering v Pickering*, 268 Mich App 1, 5; 706 NW2d 835 (2005) (internal quotation marks and citations omitted).

MCL 722.27a provides, in relevant part:

(1) Parenting time shall be granted in accordance with the best interests of the child. It is presumed to be in the best interests of a child for the child to have a strong relationship with both of his or her parents. Except as otherwise provided in this section, parenting time shall be granted to a parent in a frequency, duration,

and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time.

\*\*\*

(3) A child has a right to parenting time with a parent unless it is shown on the record by clear and convincing evidence that it would endanger the child's physical, mental, or emotional health.

\*\*\*

(6) The court may consider the following factors when determining the frequency, duration, and type of parenting time to be granted:

(a) The existence of any special circumstances or needs of the child.

\*\*\*

(c) The reasonable likelihood of abuse or neglect of the child during parenting time.

\*\*\*

(g) Whether a parent has frequently failed to exercise reasonable parenting time.

(h) The threatened or actual detention of the child with the intent to retain or conceal the child from the other parent or from a third person who has legal custody. . . .

(i) Any other relevant factors.

As was set forth in the preceding issue, the trial court thoroughly considered the children's best interests under MCL 722.23 and there is some overlap between physical custody and parenting time considerations. Contrary to plaintiff's arguments, the trial court's order regarding parenting time was tailored to the specific facts of this case with an eye toward restoring plaintiff's relationship with his children.

The trial court had well-founded concerns:

I am concerned about the parenting time that Mr. Moir has had and his ability to be able to have access to the children. He has gone through therapy for a number of years. Had a lot of sessions, I do believe that he has been clean at least for a period of times in excess of a year that he hasn't used. He, if he's going to have an opportunity, I do believe [the children's counselor] when she talks about the artificial environment for parenting time with supervised parenting time. I do believe that he, it's important for each of the children to have a strong nurturing relationship with their father.

-12-

Parenting time though is not for the parent. Notwithstanding the word "parenting time." Parenting time is really for the child. And I must be guided [by] what is in the best interest of the child[ren].

In his brief on appeal, plaintiff declares that the two incidences with N. were "unfounded allegations" and fictional. Plaintiff seems to believe that these two incidences are what caused the trial court to fear for the children's safety. However, it was not the children's physical safety, but their mental well-being, that the trial court was trying to protect. The evidence showed that plaintiff made reprehensible comments to the children and that he had acted inappropriately on back-to-back occasions in May 2013, placing N. in a situation that caused her to become confrontational with him. Although plaintiff claims that his relationship with the children was fine prior to the condo incident, that assertion is not supported in the record. In addition, the trial court found no evidence of parental alienation. Even on appeal, plaintiff fails to see that his own past behavior with the children has colored their relationship with him. Plaintiff also takes issue with the trial court's claim that plaintiff was a narcissist. Even if plaintiff does not have a formal diagnosis, the trial court was within its right to find that, at a minimum, plaintiff had narcissistic tendencies.

The trial court noted that, in spite of its award of sole legal and physical custody to defendant, it wanted plaintiff to have access to the children through the "proper channels." To that end, plaintiff was to have access to and the ability to speak with the children's teachers, counselors, and medical providers. Plaintiff would be permitted to coach the children if he first discussed it with defendant and the children's counselor. The trial court added:

In addition, whatever other parenting time in addition to [what's] been ordered [by] the Court, it is agreeable between the parties, which really means, it's up to you Mrs. Moir. If you believe the children should have additional parenting time with their father, you're not bound by – any restriction from this Court to be able to do that in your sole discretion and opinion. So that the parenting time that I've ordered is a minimum at this point in time, not a maximum.

Contrary to plaintiff's assertions, the trial court was not empowering defendant with the decisions regarding plaintiff's legal rights. Instead, the trial court appropriately determined that the children's primary caregiver was in the best position to determine whether additional parenting time would be beneficial, depending on the children's progress.

Plaintiff also seems to complain that the trial court's approach was not individualized to each child. While "appreciation and evaluation of each individual child in light of the statutory best interests factors is crucial to making sound judicial decisions in this exceptionally delicate area of domestic law," *Foskett v Foskett*, 247 Mich App 1, 12; 634 NW2d 363 (2001), it is clear that the trial court's reason for treating the three children as one unit was valid. The trial court was concerned about the perception of C. as the "most favored child" and, therefore, wanting parenting time to include *all* three children: "[W]hatever arrangement is set up for parenting time in the opinion of the Court needs to be done with all three kids rather than just [C.]. . . .I don't want to reinforce for the girls that there's a favored nation status for the son. . . .I can understand doing individual things with each one of the kids, they're all different. They all have

their own unique needs but somehow we need to break [] through this idea that somebody's special. Everybody needs to feel like they're all wanted."

At the close of the proceedings, the trial court told plaintiff that plaintiff had "done things where I have terminated parental rights" but that plaintiff knew "he's at a precipice. My goal is to lead him back . . ." Considering the evidence before it, we hold that the trial court's resolution was fair and measured.

Affirmed. Having prevailed, the defendant may tax costs. MCR 7.219.

/s/ Mark T. Boonstra
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray